My name is Michael Nate and I represent Vitran in this appeal. This case involves the proper application of the legal certainty test for removals under the Class Action Fairness Act under the CAFLA. The purpose of the CAFLA was to expand access to the federal courts for national employers like Vitran without having to demonstrate a plaintiff's case for them. In the Loudermilk case, under the legal certainty standard, Vitran must show to a legal certainty the amount in controversy, not the actual damages alleged by a plaintiff. What does legal certainty mean, Mr. Nader? Is it beyond a reasonable doubt? Is it by clear and convincing evidence? Is it a preponderance of the probabilities? Or is it a mixture of all three and something new? Well, the case law is unclear on that. I mean, they say that the legal certainty is something less than absolute certainty and something more than a preponderance of the evidence. Now, in the Loudermilk case, they say that you only have to establish the amount in controversy, right? The amount in dispute, not the actual facts or the actual damages. Vitran has met that standard clearly in this case. First of all, we have the complaint alleging maximum damages for numerous claims. Now, they do have the one disclaimer in paragraph one, but everybody knows that's not binding. And the plaintiffs have admitted, we've mentioned that twice in our brief, they've admitted on pages 319 to 322 of the record that they intend to trial, to hold open the option, that they will demonstrate and prove that every single Q to the class member missed a meal and rest break on every single work day. They've held that open. Precisely because they held that open for trial, that means that that amount is in controversy. It's been proven. So you're saying that by alleging, they didn't allege that each class member of all 156 was denied a meal break and a rest break every day that they worked for the company, do they? That's correct, Your Honor. They did not make that allegation in the complaint. However, now that we've had a year of discovery and we took the depositions of both the named plaintiffs, both of the named plaintiffs testified that they never got a meal or rest break on any work day with Vitran. And they didn't know anybody in the yard who'd gotten one. That's right. No one in the yard. They heard the same complaints at meetings of their own co-workers. And they also even testified when they came over to the page here, page 10. Let me ask you a question. We'll show you my agreements of pay matters. If they don't get 30 minutes for mealtime and they don't get 10 minutes for rest time, is the obligation to pay them premium pay? That's correct, Your Honor. And the premium pay is time and a half? It's straight time. Straight time. So, for example, a full one hour of premium pay for a missed lunch break, a full one hour of premium pay for missed rest breaks, one or two rest breaks. Oh, it's straight time, but full one hour for both. That's correct. Not 30 minutes and 10 minutes. That's correct. If they'd given them mealtime and break time, then it'd be 30 minutes and 10. But if they didn't give them, they've got to give them pay an hour extra for meal and an hour extra for break. That's correct. Do I have you right? That's right. Okay. So Bytron has clearly demonstrated with the plainest testimony that they never got a meal break. They also say that all their other co-workers never got a meal break or rest break, and that they heard this complaint at meetings, that they understood this with other guys who all complained in the yard, and they even understood this statewide, and that's in page 10 of our brief where we mention that. Now, as a result, Bytron has also included additional facts to demonstrate with the legal certainty the amount in controversy. They provide the actual facts of the actual number of peer-to-class members. That's not in dispute. The actual payroll periods for the class period, the actual dates of employment for all the peer-to-class members, and the actual rates of pay for all of the peer-to-class members. So clearly, Bytron has manifestly proved with the legal certainty the amount in controversy, the amount in dispute. Now, the plaintiffs would respond that, oh, no, you need to include manifests of the drivers. Somehow we have to have an affirmative showing of actual admission of liability now in order to demonstrate that we qualify under the capital. Do you have to show manifest? Yeah. A driver manifest is a recording of a driver's daily activities. Manifests usually would record, for example, a rest break taken. I'm sorry, a meal break taken, the 30-minute meal break. Not necessarily rest breaks, though, because there's no requirement to actually record those. Are these automatic devices which show that the truck is stopped during meal breaks and stopped during rest periods? That depends on the actual employer. I believe with Bytron these are paper manifests filled out by the drivers. Filled out at the end of the day? I believe so. Okay. There are thousands of them in this putative class. We've given plaintiffs full access to the warehouse of these manifests. Now, are we now supposed to produce manifests now and then somehow admit that the drivers missed lunch breaks or rest breaks? And then the question comes, how many? Is it one for the named plaintiffs each? Do we have to include manifests for every single facility? There are six facilities in California. Do we have to include every single manifest for each, for example, each shift in the case? So, for example, do we have to include one manifest of one driver in every shift in every six facilities? Will that be enough? Or, as I would presume, the plaintiffs would argue, oh, no, still you're extrapolating too much. We don't have enough evidence. It's all speculation and conjecture. Even with the manifests, you're not going to be able to demonstrate with legal certainty that the amount of controversy exceeds half the minimum. Then they also claim that we have to produce testimony, declarations or depositions from our own drivers stating, basically admitting that they missed meal and rest breaks in order to establish the amount of controversy. Or even our own managers, our dispatchers, as if we have to now produce. Basically, we're proving the plaintiff's case here. We have to produce testimony from our own. Mr. Nader, I'm confused. As I understand class actions, and in particular this class action, the plaintiffs claim to be adequate representatives of the plaintiff class, and they claim that their damages are typical of the class. And if that is so, and that is required, especially under Walmart, to show typicality and that you have claims that are more easily disposed of in a class action than in individual cases, what is the weight that we should assign for purposes of legal certainty to the allegations of the complaint that they are typical representatives of the class and their claims are typical? That would mean to me that if they've never been given a meal break, never been given a rest break, and they claim that they're typical of the class, that means the class hasn't been given a meal break or a rest break. Am I wrong on that? I think you're correct, Your Honor. Precisely because of the typicality and allegations in the complaint in a class action, if both the named plaintiffs have testified, provided their sworn testimony, that they never received meal and rest breaks, you know, the law requires, the Catholic requires a proper aggregation, and we can properly aggregate, not extrapolate the sort of an economics term that the plaintiffs have used, but we can properly aggregate those claims throughout the whole class. You know, for them, what the district court made them, assuming that Vitrin had to make an affirmative showing of how much, how many damages are actually in existence in this case. For example, the district court concluded, the defendant points to no specific evidence to affirmatively demonstrate that enough members of the class did not receive meal and rest breaks, so as to prove to a legal certainty that damages will exceed $5 million. Well, that cannot be the standard. It cannot be the case that Vitrin must now prove plaintiff's case in order to get access to the federal courts. That's not the purpose of the CAFA. Mr. Nader, here's to, I'm going to get back to Judge Bay's original question. All these terms that we use, preponderance, clear and convincing, I read Loudermilk about three times trying to understand it. They cite approvingly, the Loudermilk court, the term reasonable probability. Okay? Here's the way I get your argument. The second time you removed, you said, the reason we're removing is there's 156 plaintiffs. We have the testimony of Campbell and Maldonado. They are typical, as they have to be under Rule 23. You did the multiplication, and therefore, it came out over $5 million. That's why you say the district court had jurisdiction. Is it that simple, your argument? I believe that would be sufficient, but we go on to argue more facts than that. We also say that, sorry. Is that a reasonable probability? I would submit that it would be. Okay. Is that the same as a legal certainty? I mean, I would argue that, yes. The reasonable probability should be the same. For example, in the Brill case under the Seventh Circuit, the Fifth, Sixth, Seventh, and Eighth Circuits are all different, where they claim that this is an inversion, and it should be the reasonable probability. Well, just last week, my circuit said, if when you claim under $5 million, that's the end of the analysis. Have you read Rohlvig? I have not read it. Okay. It's based on the doctrine of judicial estoppel. You can't claim it's under $5 million and then go into court and ask for more. And I believe it was the Brill case, but I don't remember exactly which case, but there is case law, not even Bell v. Hershey, that says that judicial estoppel will not apply here, and that there's nothing binding on making a disclaimer in your complaint that you're seeking relief under $5 million. It's simply not binding in the state. So in addition to the testimony by the named plaintiffs, that they never received breaks, that none of their coworkers received breaks, they also say that Vitrans managers, because of their daily policy of depriving them of meal and rest breaks, were also responsible for people not being able to take their meal and rest breaks. So we are not just saying that we take the named plaintiffs' testimony and then simply add the typicality allegation, and then with the result we've established them non-controversial. We're also taking their allegations, actually their sworn testimony, that none of their coworkers received meal and rest breaks, and it was because of their manager's policy, their daily practice of saying, no, you have to be hot, and you have to be driving a truck, and you cannot be taking your meal and rest breaks. So, I mean, they've already testified that it was management practice. Now, the plaintiffs had ample time to enter into a binding stipulation that they're seeking recovery less than the $5 million. They never did that. They had more than a year to do that, even receiving all of our discovery. They also had ample time to amend their class definition. They could have said, well, maybe only all the folks in the Fontana facility. If we limit it to that, then we've established that not enough amount is in controversy. Then we'd be limited to that, but they never did that. In fact, on page 20 of our brief, we demonstrate that they specifically said that the named plaintiffs never got their meal and rest breaks on any day, and, quote, that may be how the evidence comes out at trial, but Bytron has not proven it yet. They're clearly holding open the option that all such damages will be proven at trial, and that far exceeds $5 million, as we've explained in our calculations. But another point, Your Honors, that's not mentioned in our brief. Now, they bring several claims under the Private Attorneys General Act. I don't know of any right that they have to hand in the state's obligation or opportunity to obtain damages. Can a plaintiff's counsel, after asserting several POGA claims, then somehow limit the state's ability to recover? I don't know any authority that they have to make those limits in their POGA claims. Additionally, Your Honors, plaintiffs provide absolutely no facts to undermine our facts. They don't talk about or question the actual facts about the POGA class members, the number of them, the payroll periods, the actual wage rates, the termination dates for Section 203 types of claims. They provide no such facts and no testimony. That failure alone should demonstrate that removal is possible. Mr. Nader, I've had your firm on Fair Labor Standards cases. With your practice, is this issue anywhere near a cert grant? The Act is now seven years old that the Congress passed. We've got Brill, Rohlvig, Laudermilk. You have to know, is this close to a cert grant to tell us legal certainty, reasonable probability, clear and convincing, or do you know? But the actual standard itself? Yes. The case law is still unclear of what that standard should be. I would submit that the standard should be the reasonable probable standard either in Brill or the inverted standard, which is frankly the proper standard that's mentioned in Guglielmo in the special concurrence by Judge O'Scanlan and mentioned in the Bell v. Hershey case where they said that only after the defendant demonstrates with a preponderance of the evidence that the case should be in federal court, then the plaintiff has the obligation to prove with legal certainty that it should not be in federal court. That's the proper way to look at this. That goes all the way back to, I believe, the St. Paul case and is well established in, I think, at least four other circuits. Well, to me, when Judge Bybee says it's a high standard, number one, in Laudermilk, and then he says there's a presumption against federal court having jurisdiction, you know, I guess that means you have a heavy burden or not. Well, I'm going to say a heavy burden, but they don't describe what the burden is. They know it's something more than a preponderance of the evidence. But they also say it's not insurmountable. I believe all those cases say that. Even Laudermilk says that. It's not insurmountable. It cannot be the case that the only way to meet that burden is to prove plaintiff's case. Then we have access to the courts. That cannot be the purpose of CAFA, which is to expand access to the federal courts for national employers like VITRE. You know, VITRE has even demonstrated that if there was only one violation per week, one violation of a meal break and one violation of a rest break per week for all the purported class members, that that would easily establish the minimum amount under CAFA. And so, therefore, we're not even just simply aggregating exactly what the named plaintiffs have argued, have testified to. We're actually taking one-fifth of what they testified to. Even though we have the typicality allegations, as well as there's one testimony that all their co-workers never got meal and rest breaks, and that this was yard-wide, state-wide, and voiced at all the meetings as well. Also, for the 203 claims, we've established very clearly, actually, with irrefutable evidence that we had never paid any premium pay under 203. So, therefore, for all the individuals who were terminated during the class period, they would be entitled to a full 30 days of penalties. Those facts did not exist, for example, in the Green case. Those facts did not exist in the Loudermilk case. In Loudermilk, they talked about speculation and conjecture, and that was because they didn't even know what the class size was. Well, of course there was speculation and conjecture. You couldn't make any analysis or any factual calculations at that point because they didn't even know where the named plaintiffs were. The plaintiffs here, in this case, actually claim that speculation and conjecture is the basis of their own testimony, of their own named plaintiffs, that they're simply speculating about the meal and rest breaks received by their coworkers or yard-wide or at the meetings. Oh, in fact, they've actually testified that that's what they heard. Those were the complaints that they actually heard. So the speculation and conjecture that is the mantra in Plaintiff's Brief does not apply here whatsoever. It's not the case as in Loudermilk. My question is, if the appellees are successful and the motion to remand stands and the case goes to trial and they put in evidence for more than $5 million, at that point are you entitled to remove? No matter where we are in the trial, if the jury is about to go out, you say now evidence goes in, more than $5 million, we want removal. I would submit that we should be able to. That should be a piece of paper that gives us 30 days to remove the case at that point. If they've been pushing for these maximum amount of damages and then they start demonstrating that or seeking that in the trial, I think that would be irrefutable evidence. But if they were to stipulate that under no circumstances adding compensatory damages to punitive damages to attorney's fees to interest, would their recovery be more than $5 million? Would you agree that the motion to remand should stand? They could have done that, but it's too late. They needed to enter into that binding stipulation at the time of removal. They never did. They had a full year to do that, and they never did. So it's simply too late for them to now stipulate or enter into a binding stipulation. Why is it too late? Because that decision is made at the time of removal. It cannot be made after removal. Is that because of the statute? That's correct, Your Honor. We're over your time. Oh, I'm sorry, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. I'm Alexander Wheeler, and I represent the appellees. I think we all agree that the ---- Could you please address the last point that we discussed with Mr. Nader? Mr. Nader, do you agree that you didn't stipulate at the time of removal that damages for the class would not exceed $5 million? Yes, Your Honor. I agree there was no stipulation. All right. Secondly, do you agree that under the statute, CAFA, that stipulation to retain State jurisdiction must be entered into at the time of removal? I've never seen anything in the text of the legislation that says that. Do you disagree with that? The only reason I'm hesitant to disagree is because ---- Are you willing to do that now? Would you stipulate as a judicial admission binding on the class that you do not seek damages compensatory, punitive, interest, attorney's fees beyond $5 million? Absolutely not. Well, thank you. Yes. And let me expound, Your Honor. You've made our task, at least my task, a lot simpler. Go ahead. And I'd like to learn why, perhaps through some questions from Your Honor. But in the Loudermilk case, the Court, this Court makes very clear that when a plaintiff files a putative class action, they don't know what the damages will be. You know, when two people come forward and they say our claims are typical enough as to liability that we think we can meet the commonality and predominant standards under Rule 23. Well, you did in your complaint say that your damages were below $5,000. $5 million, yes, Your Honor. $5 million. Yes. But what the court in Loudermilk says is the plaintiff is the master of his or her complaint, is allowed to do that at the pleading stage. And if facts arise later on that disprove that jurisdictional allegation in the complaint, there are safeguards under CAFA to make sure that there are no untoward results. And one of those safeguards is the ability to remove, as Your Honor explored with my adversary, at any time within 30 days of that new evidence appearing. So I would, to answer your question, I would not stipulate. We have pled jurisdictional allegations that put the burden completely on the defense and the burden to disprove that $5 million. We'll go to trial in the State Court. You put on your economist and he puts on the white board or black board or whatever it is, not $5 million, but $50 million. And he's cross-examined by Mr. Nader. And at that point, there's a recess, and Mr. Nader comes back and he says, for the first time now, we have established with legal certainty that the plaintiff is seeking more than $5 million, and we'd like removal to the federal court. The jury's sitting there. The judge is sitting there. They put other cases off to hear this case. And Mr. Nader gets his removal, right? If it happened that late, that's true, Your Honor. I would submit that would happen much earlier in the case when expert designations happened, when reports were submitted, and when expert depositions were made. Well, even if it comes up at the end of the case, even when a jury's out, if a proper motion for removal is made, it's removed. That's my understanding. That's mine as well, Your Honor. I've had cases removed where people were in trial for like a month. And a motion to remove is made, and it falls within the requirements. And the superior court judge gets mad because he's spent all that time and calls me. And because I was on that court, wonders what I'm doing, and I said, I'm not doing anything. They have that right to remove. I don't want them. You can have them, but they're here. That's what the statute, that's what CAFA allows for, Your Honor. And Loudermilk actually addressed that very scenario on page 1002 to 1003 of the opinion. And the court talks about the fact that this may end up happening. What's the purpose of this legislation? Purpose of CAFA? In general? Yeah, the underlying legislation in this case. I think there's been a lot of debate over the overall purpose of CAFA. At the beginning, I think a lot of commentators were saying it, as defense counsel mentioned, expanded federal access, or I should say access to federal courts in class actions, but under very narrow scenarios. So there are cases that I think that's what defense counsel prefer. Certainly. Federal court. Right? That's the way things are lining up in this case, yes, Your Honor. Yeah, because you don't get any unanimous verdict of a jury. I think there are a whole host of reasons why. Yeah, there are lots of reasons. Why the defense prefers federal court. Mr. Wheeler, actually, Mr. Nader said the purpose was to expand federal court jurisdiction for national employers. I didn't see that referenced in your brief. Did you talk about the reason for CAFCA in your brief that I missed? I did not, Your Honor. Okay. What I did talk about. No, is he right that that's the reason for CAFCA, is to expand federal jurisdiction for national employers? Absolutely not, Your Honor. I don't think there was any part of CAFCA that has anything to do with employment law specifically whatsoever. So one of the reasons is to increase diversity of jurisdiction when the value of a case is above $5 million. I would agree with that concept, Your Honor. But I think we also have to view that legal argument within the backdrop of a strong presumption against federal jurisdiction even after CAFCA. And that concept is talked about and illuminated in Loudermilk, and it goes back to the 1992 decision by the Ninth Circuit in Goss versus Miles. And that stands even after CAFCA. There is a strong presumption against federal jurisdiction. And what Loudermilk talks about is we have these safeguards. If a plaintiff chooses as master of his or her complaint to limit the damages to $5 million or below, there is a very high bar, and that's the word the court uses, a very high bar for the defense or the removing party to overcome that presumption. And we talked, had some discussion about what legal certainty means. The district court that has looked at the issue has said it's something less than absolute proof, or maybe that's not the direct quote, but it's something less than completely accurate. So it's almost akin to what a jury would have to find to convict and send somebody to prison in a criminal case. Any case says that? No, I'm drawing by analogy the fact that it's certainly above preponderance. Let me ask you a computational question. You do agree, I take it, that if we indulge with the defendants that each of the 156 members of the class – first of all, there are 156 members of the class, correct? Well, Your Honor, that's information that's within the defendant's knowledge. I have nothing to dispute that. All right. So I'm willing to agree with that. So you have no basis to dispute those 156 drivers. Let's take 156 drivers. If they missed one meal and one rest break per week, not per day, but per week, do you dispute that the damages would compute to more than $5 million over the four years? I have no basis to dispute that, Your Honor. All right. Now, the next thing – pardon me. Next question. Your two class representatives have testified that they worked there – for how long did they work there? It's an aggregate of 17 months out of the four-year class period. All right. While they were working there, they didn't miss a meal and a rest period a week. They missed a meal and a rest period per day, every day without fail, correct? Correct. All right. And they also testified under oath that they talked to people in the yard and they found no one who'd ever been given a meal or a rest break, correct? Their comments, I think, were limited to their personal knowledge of what they overheard. These are drivers. Right. Their job is somewhat autonomous. So – and they're in the yard, they're driving, and they don't know of anybody – there's no fair-haired favorite of a straw boss that got one meal or one rest break, right? With the same caveat, Your Honor, that it's limited to personal knowledge in one of five yards across the state. That being said – All right. So now, you also allege that your people have claims typical of the class. We know what typicality means in the Walmart case, so tell me why these allegations in your complaint and the proof which you do not dispute as to the computational matters don't add up to more than $5 million. Foundational facts again, Your Honor. I don't have any basis to dispute those. What I do dispute is the extrapolation on the basis of typicality. And just – Walmart versus Dukes is a case – Are you saying that your people really aren't typical? Absolutely not. And I think this is – let me get there, Your Honor. I think that's actually – this is the most academic and interesting part of this issue before the Court, is to what extent does typicality mean that you can take the testimony of people with limited personal knowledge and extrapolate it across an entire putative class? And the answer to that is that typicality, which wasn't actually addressed in Walmart versus Dukes, that case is only a commonality case, and it's very narrowly limited to that. But in any event, the typicality requirement does not require typical damages to be suffered class-wide, and there's legions of Ninth Circuit authority that hold that a variation in damages does not destroy either commonality or typicality under Rule 23. So the typicality requirement has to do with typicality, similarity of injury as concerns liability. But the fact that there might be differing variations of damages suffered by the class in a wage and hour case does not destroy that whatsoever. And just to sort of expound on that a little bit, Your Honor, if there are hours worked in a misclassification case, so a manager comes to court and says, I was misclassified as salary, and so was everybody else at Walmart or Save Honors or a big employer. Some people may have worked one hour. Some people may have worked 20, depending on certain characteristics of the store. That damages difference does nothing to harm typicality, and we've cited cases in our brief that talk about that concept of typicality applying only to the liability facts, not to the damages facts. We had a case many years ago in Pasadena where the Pasadena taxi cab eaters were not properly set, and some people had taken a cab once and some people had taken a cab every day for a period of time. Some people had much bigger claims than others, and the claim was still typical. I agree with that. I don't know if that was a reported case, but I agree with the concept. The differing damages. California case. And that's what we're dealing with here, Your Honor, is differing damages. So the burden is on the defense to prove to a legal certainty that the damages calculations are over what we've capped ourselves to at this early stage, and they simply have not done that. It's impossible to meet that high standard of legal certainty by taking two individuals and extrapolating it across 156, which is exactly what they've done. Doesn't the defendant say that they didn't give meal or rest periods to any of the 156 during the four years? No, absolutely not. That's the admission of liability that the defendant is trying desperately to avoid doing. What they've done is they've admitted there are records in their possession that say whether or not these breaks were taken, but they say we don't have to give them to the court because that would prove liability. We don't have to do that. All we have to do is look at plaintiff's allegations. That cannot meet the legal certainty standard, because what they're attempting to do is avoid putting anything before the court that will later be used against them. But the proof is what it is. If the proof is all of these records that show whether or not the breaks were taken, then that's what they have to come forward with. And the Brill case and the Latimer case. You've pleaded that everyone was denied the meal and rest periods, and therefore it's above $5 million. But don't ask us to admit that. Absolutely. And they're very careful. And I find it interesting they rely upon the Seventh Circuit decision from 2005 in Brill versus countrywide home loans, Your Honor, because in Brill the defendant admitted liability to get into federal court. What they said is we admit to sending these faxes. It was one of those, I forget the name of the federal statute, but it's the case where you can't send junk faxes out to people, and if you do you're going to be hit with this huge statutory fine, and it's per violation. What the defendant did there is say we sent them. So whether or not it's willful is something we're not willing to admit, but we admit to sending these faxes, and that's where the foundation to arrive at the damages calculation arose from. And the same thing happened, Your Honors, in Verizon versus, pardon me, Lewis versus Verizon Communications, which is I think a 2010 case from this court. The defendant in that case, Verizon, admitted to having overcharged certain customers and admitted that a refund was appropriate. So this concept that defense counsel touches upon, that we shouldn't be able to admit any liability, and that's a shield against what we have to come to court with to prove amount of controversy, that's refuted by the very cases they rely upon. So I think that's an important point. And both of those cases as well, Your Honors, note that you have to look at who the party is that has greater ability to bring evidence before the court. Loudermilk talks about it and so does Brill, where the employer has the records, which we've heard about. And what they say is, well, you have access to them. And what we're doing is sending people there to look at them, and it's a huge volume of paperwork. We will admit that. But they've admitted they have this information. They just don't want to come to court with it. And so under Brill and under Loudermilk, where the employer has more information, and this is the stuff that will conclusively prove jurisdiction one way or the other, they've got to come forward with it. And they can't hide behind this argument that, oh, but that would require us to admit liability. What do we do with your allegations that Vitron, if that's the proper way to pronounce it, regularly and consistently failed to provide uninterrupted meal and rest periods to plaintiffs and the other class members? Regularly and consistently means now and then? Your Honor, I... Or regularly, because dictionary definitions regularly means every time. If this were a preponderance case, Your Honor, perhaps that would be a decent argument for the defense. But it does not change... So we have to take your allegations as true? I don't think... Not in the same way that a 12b6... I actually disagree with that, Your Honor. This is not a 12b6. What it is is once we make that jurisdictional allegation, automatically the burden shifts. But you want us to take some of your allegations as true, that is you don't want more than $5 million, like in Loudermilk, but some of your other allegations as maybe not true. I'm not sure that I agree with that, Your Honor. I don't think that I'm being slippery with any of the allegations. You use the words regularly and consistently over and over and over again. Now, my statutory, my dictionary definitions of regularly and consistently is every time. I regularly go to work at 9 o'clock means I get there at 9 o'clock every day. Now, I don't happen to do that, but if I were to allege that in a complaint, wouldn't that say that I get there every morning at 9 o'clock? What I don't think that would allow a defendant to do with those allegations is to come to court and meet the legal certainty standard with specific evidence of amount of violations. How more certain can he be of your allegations and your allegations? There are still facts that have to be given before the court when we plead the under $5 million. So we have to look at both of them together. There is something of a jurisdictional magic word to that allegation that's phrased directly in Loudermilk. Once the plaintiff is willing to, at least at the beginning of the case, cap his damages, the burden shifts. Regardless of the allegations that may be able to be read one way or the other, they have to have conclusive proof under legal certainty that that jurisdictional allegation taken alone is wrong. So I think what Your Honor is getting at is, well, does your jurisdictional allegation conflict with regularly and consistently such that they cancel each other out? And I think the answer to that is no, because of the nature of jurisdictional allegations. They are of a different import, especially under Loudermilk, where the three-tiered Ninth Circuit burdens of proof, depending on what you plead as far as amount of controversy, that's what triggers the burden. So the fact that we've pled regularly and consistently doesn't take away the jurisdictional allegations that kick in the legal certainty standard. I'd also like to point out, Your Honor, we've discussed. I think you're over your time. Okay. Are you through? More or less, Your Honor. I have a few points that I could make, but I think that we've touched on everything. Thank you. I just want to go ahead quickly. What's behind all of this? That is a problem. I did bring a chart, Judge Fragerson. I mapped it out. I just wanted you to know that. I think what's behind it all is ñ Good boy. I wanted to get some credit for that. I think what's behind it all is there is a very high burden that this defendant has to meet, and the courts have characterized it as requiring summary judgment-type evidence. If a plaintiff walked into court and said, I've met legal certainty by summary judgment-type evidence, by the testimony of two people extrapolated to 156, if a plaintiff did that, they'd be laughed out of court. And I think that's what's behind it all is the Ninth Circuit's been clear about the burden, and the defense hasn't met it here. The district court got the remand order right. There's speculation. There's conjecture. There's conjecture. That's before the court. And under Loudermilk, you do have to prove it, even if it requires you to make admissions. The district court, of course, has sent it back to the state court. That's what happened. Twice. That's where you prefer to be. Yes, Your Honor. Why is that? Well, I mean, I think you're right. I'm sorry? Why is that? It has nothing to do with whether or not we like you, Your Honor. Oh, no, I know that. I haven't been doing this very long, but what I understand is that- Scalia? You didn't know that, did you? He didn't know what? I'm still suffering. I dissent. That got reversed. And did you dissent? It's all right. You got better foresight than I have. So what's the purpose of the statute? The purpose of CAFA overall? Yes. I think it is to some extent to increase the access to federal courts where very specific criteria have been met. And that's what the Ninth Circuit looked at, the backdrop between the intent of CAFA with the holdover principle of presumptions against federal jurisdiction that were found to have survived CAFA. So there's a little bit of a balance. We have new legislation, but also a closed door to federal court in very specific circumstances. So that's why this Court in Loudermilk balanced those interests and says, well, if a plaintiff is willing as master of her complaint to cap themselves at the early stage, we're going to put a pretty heavy burden on the defense, who, by the way, has all of the records and access to managers, documents, manifest that could prove it one way or the other. That's when they have to come forward with that concrete evidence that may or may not hurt them, like in Brill, like in Verizon. Admissions may or may not hurt them later on, but that's the hurdle they have to go over where the plaintiff caps at under 5. I think that's the purpose, and I think that's the answer to the question in this case, Your Honor. That's the burden they have to overcome to get into federal court. When the jurisdictional allegations of under $5 million are made at the outside, yes. Yeah. Do they prefer to be in federal court and you representing the plaintiffs prefer to be in state court, generally? Generally, I agree with that principle, and that's how we've been litigating this case is pretty apparent from the record. Well, I don't blame you for that. Okay. Thank you, Your Honor. Mr. Nader, why don't you remove this case from controversy by simply admitting that none of the 156 people who were in the class ever got a meal break or got a rest break, and therefore, that being so, we can just dispose of this case in a memorandum disposition. And I'd be depriving my client of the due process right to access to federal money. And some money, too. And plenty of money. That's right. That's right. Just real quickly, in Bell v. Hershey, it's 557 F3rd 953, they answer two of the specific questions from Your Honors this morning. First of all, on page 958, they make it clear that the stipulation, the binding stipulation to limit the amount of controversy, must be made at the time of the complaint. Other than that, it's too late. And on page 959 of Bell, they state very clearly that the doctrine of judicial estoppel is also unavailable, so we can't use that doctrine as well. A couple more points, very quickly. In CAF, it was supposed to increase access to the federal courts. A couple of the points that they actually made. I think it was three specifically. It would help a uniform development of the law in important class action cases that have reverberations on interstate commerce. It will also foster innovation and consumer protection. These are things specifically stated in the findings of Congress. And also, Your Honor, I would submit that Congress wants cases like these to be in federal court for those reasons, to meet those purposes. Lastly, you know, the plaintiffs argue that, oh, we should have produced manifests, driver manifests, to demonstrate the actual amount of damages here. Well, I mean, the plaintiffs have also argued all along that those manifests are not accurate. They don't prove anything. So even if we provided the thousands of manifests here today or with the district court, the plaintiffs would still be arguing that those are false, those are faulty, and therefore no amount of controversy has been proven. Thank you, Your Honors. All right. Thanks. No, we don't have a server. I understand that. But to the extent it's important to the court's analysis, I haven't briefed it. It's not before the court. It's under the table of authority. What do you want? If the court's going to consider this case that's been cited several times, I would just like another brief to be able to talk about it because I haven't read it. That's the only reason for my point. We would have to grant further briefing because counsel hadn't read a case? It's not in the table of authorities that counsel's been arguing. So it's a surprise. That's why I bring it up. That's all right. How much time do you want? Ten days? I raise it only because if it's going to be important to the opinion and considered by Your Honors, I would like an opportunity to brief it because I haven't seen it. We can't tell you what's going to be important to the opinion now. Beyond that, counsel, will you do what counsel in Laudermilk didn't do? Will you give us an extra ten days? Did you read the footnote in Laudermilk? Congress put that up pretty shortly. Yes, I know that. All right. Thank you, Your Honors. I don't know what you're thanking me for. Actually, I had a judge get mad at me the other day for that, too. I think it's just customary. Oh, okay. Thanks. We'll recess until 9 a.m. tomorrow morning.
judges: Pratt, Pregerson, Bea